# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

BRAD COOK and HANNAH
RITZENHEIN, individually and on
behalf of all others similarly situated,

        Plaintiffs,

   vs.                               Case No.

LAKE MICHIGAN CREDIT UNION,

        Defendant.

_____/

**CLARKSON LAW FIRM, P.C.**       **DEMAND FOR JURY TRIAL**
Ryan J. Clarkson (P68616)
*rclarkson@clarksonlawfirm.com*
Yana Hart *(Pro Hac Vice Forthcoming)*
*yhart@clarksonlawfirm.com*
Tiara Avaness (*Pro Hac Vice Forthcoming*)
*tavaness@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070
*Attorneys for Plaintiffs*

_____/

# CLASS ACTION COMPLAINT
## <u>INTRODUCTION</u>

1.    Defendant Lake Michigan Credit Union ("Defendant" or "LMCU") has become the most profitable credit union in Michigan by, in part, denying the workers responsible for their success—their Loan Officers—rightful, earned compensation, in violation of Michigan and federal law.

2.      LMCU's unlawful wage scheme works like this: (1) LMCU lures Loan Officers to their company under a compensation structure that is 100% commission-based (which includes a baseline draw which must be paid back with earned commissions); (2) LMCU then piles on additional duties and responsibilities akin to those of a Loan Processor after the fact, which take up nearly 50% of the Loan Officer's time and energy; and (3) LMCU pays the Loan Officer **zero dollars** for nearly 50% of their work.

3.      LMCU, like many other financial institutions and credit unions, employs both Loan Officers (also known as Loan Originators) and Loan Processors (operational support for Loan Officers). There are separate and distinct responsibilities for Loan Officers and Loan Processors, respectively. On one hand, Loan Officers are responsible for securing new clients, originating new leads, and building relationships with realtors and various vendors to ensure a constant flow of borrowers.[1] On the other hand, Loan Processors are considered support staff; they provide operational support for Loan Officers, with duties ranging from assembling and organizing documents to communicating with borrowers in obtaining/gathering the necessary documents to process loan applications.[2]

---

[1]    *Mortgage Loan Originator,* LAKE MICHIGAN CREDIT UNION, https://lmcu.wd5.myworkdayjobs.com/en-US/lmcucareersite/job/Troy-MI/Mortgage-Loan-Originator_REQ-2022-2573 (last accessed September 1, 2022).
[2]    *Mortgage Processor*, JOB SEARCHER, https://jobsearcher.com/j/mortgage-processor-at-lake-michigan-credit-union-in-cape-coral-fl-Ke7DM55 (last accessed September 1, 2022).

CLASS ACTION COMPLAINT

4.    A Loan Officer's role is centered around connecting with prospective borrowers and originating new loans (*see Fig. 1*). As a result, Loan Officers are only paid commission on processed loans which they originated or secured. The start of the loan origination process requires the Loan Officer to acquire the necessary preliminary information and build a relationship with the prospective lender, during which time the loan is in the "pre-approval" stage. (*See Fig. 1.*) Once the interest is "locked," the loan shifts to the "active" loan stage, and all procedural tasks are to be completed by the Loan Processor. (*See Fig. 2.*)

Fig. 1. *Life of a Loan: Step One: Loan Origination*



Fig. 2. *Life of a Loan: Step 2: Loan Processing and Underwriting*



5.      However, although a Loan Officer's commissions become vested when the interest rate is locked, LMCU does not pay commissions until the loan is funded. As such, a Loan Officer's ability to make a living is heavily dependent on: (1) allocating time to secure new loans by creating and building relationships with various vendors and ensuring the flow of leads; and (2) having a reliable Loan Processor complete their expected tasks and bring the originated loan to fruition.

6.      In stark contrast, Loan Processors are paid hourly for their administrative duties and also receive a small bonus when the loans are funded. Since Loan Officers are only paid through commissions from the funded, processed loans, financial institutions like LMCU are expected to provide Loan Officers with the requisite support—enabling them to obtain and secure leads to their full potential.

7. LMCU unjustly profits from this coercive, predatory employment scheme. Seeking to lower their expenses and improve their already high revenues, LMCU exploits and cheats their Loan Officers by forcing them to perform **uncompensated**, administrative Loan Processor work instead of providing the requisite loan processing support staff. Loan Officers have no choice but to work exponentially longer hours, oftentimes 80 hours per week. Nearly 50% of these hours are dedicated to completion of Loan Processing tasks, for which Loan

Officers are **not paid**. <u>**In essence, for every dollar that LMCU paid one of its Loan Officers, LMCU should have paid the Loan Officer almost two .**</u>

8. Instead of maximizing Loan Officer's profits and opportunity to earn more money by securing more loans and interested borrowers, Loan Officers were compelled to complete **uncompensated** loan processing tasks in order to finally receive their previously vested loan commissions.

9. Unlike LMCU, Loan Officers cannot afford to "cut costs," by delaying the loan processing of their applications. Not only would they be unable to make a living, but their reputation is also on the line. A Loan Officer that does not facilitate the timely execution of a loan is considered disorganized and unprofessional. However, LMCU is well aware that Loan Officers, desperate to bring their originated loans to fruition, will inevitably complete the unpaid administrative tasks, thereby cheating Loan Officers out of nearly half of their income. All the while, LMCU is eliminating salaries to administrative employees, substantially decreasing costs, and serving its own interests.

10. Loan Officers work tirelessly to generate loan-based revenue for Defendant and rely heavily on work that is done by Loan Processors to avoid spending hours obtaining the loan-related documents and conducting administrative work for which they are not paid. Even when the assigned Loan Processor is incompetent, unreliable, unavailable, or overworked, Loan Officers are left with no

choice but to do the **uncompensated** administrative work themselves. Otherwise, the Loan Officers will seldom see the fruits of their loan origination labor, since they do not receive commission until the loan is funded, even though their work on a loan is supposed to officially "end" when the application process begins. (*See Fig. 1 above.*)

11.    Defendant owns over $11.8 billion in assets and over $7.7 billion in originated loans. Nevertheless, Defendant cheats its Loan Officers out of rightful compensation for nearly 50% of their hours worked completing uncompensated administrative tasks which should be completed by a Loan Processor.[3, 4]

12.    Defendant falsely portrays company values of support, respect, and community. Ironically, Defendant states, "Beyond the numbers, figures, and calculations, when you come to work for LMCU, you become part of a family. This is a family that values your efforts and treats you with respect, dignity, and fairness."[5] Defendant markets a supportive work environment, when in reality, Defendant exploits Loan Officers' time, energy, and ultimately, denies them their rightful compensation.

---

[3]    *LMCU Company Profile*, LAKE MICHIGAN CREDIT UNION, https://www.lmcu.org/about/company-profile/ (last accessed September 1, 2022).
[4]    *Lake Michigan Credit Union Annual Report 2020*, ISSUU (April 5, 2021), https://issuu.com/lmcu/docs/11514_2020_annual_report_condensedpages    (last accessed September 1, 2022).
[5]    *The Benefits of Working at LMCU,* LAKE MICHIGAN CREDIT UNION, https://www.lmcu.org/about/careers/benefits/ (last accessed September 1, 2022).

13.    Defendant has continuously exploited Loan Officers' time and efforts, by forcing them into an unlawful compensation structure that requires them to perform nearly half of their work for **zero compensation**. Loan Officers are forced to work for free on a multitude of administrative (Loan Processor) tasks in addition to their loan origination work. Loan Officers sacrifice their free time, or time they would otherwise allocate to compensable work like securing new borrowers, in order to conduct the free administrative work for loans to be processed (reasoning that to do otherwise would risk losing the commission altogether). Thus, in addition to receiving zero compensation for nearly 50% of their time which is devoted to administrative Loan Processor activities, Loan Officers suffer lost opportunities to generate additional compensable income through securing leads and building relationships.

14.    LMCU claims Loan Officers' income "is limited only by [their] desire and motivation to grow." In reality, LMCU limits Loan Officers' income by forcing them to spend nearly 50% of their time and energy **on uncompensated work** not within their job description. Such work, for which Loan Officers are not compensated, forces Loan Officers to take time away from their income-generating task of securing new loans.[6]

---

[6]    "Mortgage    Careers,"    Lake    Michigan    Credit    Union, https://www.lmcu.org/about/careers/mortgage/ (last accessed September 1, 2022).

CLASS ACTION COMPLAINT

15.     Brad Cook and Hannah Ritzenhein ("**Plaintiffs**"), were Loan Officers at LMCU, who, along with many other Loan Officers, were cheated out of rightful compensation when LMCU **forced them to work for free on uncompensated administrative Loan Processor activities, which took up to 50% of their time and energy**. Instead of dedicating their time to compensable work like securing new clients and earning commission, Plaintiffs were forced to spend nearly half of their time and energy conducting operational and administrative processing work which was not only outside the scope of their position, causing them to sacrifice hours that could have been invested in Loan Officer tasks that generate commissions, but was also **entirely unpaid**.

16.     Not only did Defendant fail to compensate Plaintiffs on an hourly basis for these administrative tasks, but more importantly, Plaintiffs lost significant monthly income from their potential commissions as a result of the increased workload and their inability to dedicate these hours to securing new leads/loans.

17.     For example, if a Loan Officer secured a number of clients, for which loan applications were "active," and was unable to secure new clients because his or her support staff was not working on the loan processing of the currently "active" applications, the Loan Officer then is unable to (a) receive the commissions for the "active" loans until they are processed; and (b) secure additional clients to increase

their commissions as a result of needing to complete the administrative work to expedite the loan funding process.

18.    Loan Officers are paid through a pure commission structure. However, during the months when a Loan Officer's loans are not funded, Loan Officers cannot receive any commission. LMCU then "lends" a salary payment in the amount of $1,600 to the Loan Officer for that month, which is drawn against the Loan Officer's commission the following month, until the draw is fully repaid to LMCU. Therefore, when Defendant fails to compensate the Loan Officers for all noncommission-based work duties, it exploits Plaintiffs and impacts their ability to secure new loans and generate substantially larger income, in violation of state and federal labor laws.

19.    Plaintiffs seek among other things, all wages, benefits, restitution, and statutory penalties. Plaintiffs seek to represent the following individuals, collectively, the "**Class Members**:"

a.    "**Class A**" or the "**State Unpaid Wages Class**:" All current or former LMCU Loan Officers who worked for Defendant at any time beginning three (3) years prior to the filing of the Complaint through the date of class certification order (the "**State Unpaid Wages Class Period**"), who were required to work on the loan after the loan application became active.

b.    "**Class B**" or the "**State Overtime Class**." All current or former LMCU Loan Officers who worked for Defendant at any time beginning

three (3) years prior to the filing of the Complaint through the date of class certification order (the "**State Overtime Class Period**"), who were required to work on the loan after the loan application became active, and worked more than forty (40) hours per workweek.

c.   "**Class C**" or the "**Separation Pay Class**:" All current or former LMCU Loan Officers who were terminated or left voluntarily at any time beginning six (6) years prior to the filing of the Complaint through the date of class certification order (the "**Separation Pay Period**"), who did not receive commissions for their active loans within forty-five (45) days of the date of separation.

d.   "**Class D**" or the "**Federal Unpaid Wages Class**:" All current or former LMCU Loan Officers who worked for Defendant at any time beginning two (2) years prior to the filing of the Complaint through the date of class certification order (the "**Federal Unpaid Wages Class Period**"), who were required to work on the loan after the loan application became active.

e.   "**Class E**" or the "**Federal Overtime Class**:" All current or former LMCU Loan Officers who worked for Defendant at any time beginning two (2) years prior to the filing of the Complaint through the date of class certification order (the "**Federal Overtime Class Period**"), who were required to

CLASS ACTION COMPLAINT

work on the loan after the loan application became active more than forty (40) hours per workweek.

## **PARTIES**

20.    Plaintiff **Brad Cook** was, at all relevant times, a resident and citizen of the State of Michigan. Mr. Cook was employed by Defendant as a Loan Officer in the State of Michigan, from approximately August of 2013 to September of 2020. Mr. Cook was forced to spend nearly 50% of his time and energy performing **uncompensated** work notwithstanding the fact that he was paid income only for Loan Officer work.

21.    Plaintiff **Hannah Ritzenhein** was, at all relevant times, a resident and citizen of the State of Michigan. Ms. Ritzenhein was employed by Defendant as a Loan Processor in the State of Michigan, for one year, from approximately May of 2015 to May of 2016. Ms. Ritzenhein was thereafter employed by Defendant as a Loan Officer from approximately May of 2016 through February of 2022. Nevertheless, from 2016 to 2022 Ms. Ritzenhein was still required to perform the same duties as a Loan Processor notwithstanding the fact that she was paid only commission for loan origination responsibilities and was entirely uncompensated for the loan processing duties.

CLASS ACTION COMPLAINT

22.    Defendant Lake Michigan Credit Union is the largest credit union in Michigan.[7] They offer personal and business banking services, as well as mortgages, loans, and insurance. As of February 28, 2022, LMCU had over **$11 billion in assets**, **over $7 billion in loans, and 520,786 members.**[8] According to their "Find a Loan Officer" section of their website, LMCU has presently over 100 Loan Officers across their different branch locations.[9] They have sixty-five (61) branch locations, spanning forty (35) cities and two (2) states.[10] LMCU is authorized to conduct and is conducting business in the State of Michigan, where it is headquartered.

23.    Over the past several years, LMCU grew exponentially, earning extraordinary and unprecedented profits, in part as a result of cheating their Loan Officers.

## JURISDICTION AND VENUE

24.    Venue is proper in this district because Defendant resides, employs numerous individuals, has multiple branches, originates and services billions of dollars in loans, and otherwise conducts substantial business in this district. MCL § 600.1621.

---

[7]    "LMCU Company Profile," Lake Michigan Credit Union, https://www.lmcu.org/about/company-profile/ (last accessed September 1, 2022).

[8] *Id.*

[9]    "Find a Loan Officer," Lake Michigan Credit Union, https://www.lmcu.org/personal/borrow/mortgages/find-loan-officer/ (last accessed September 1, 2022).

[10] "Locations," Lake Michigan Credit Union, https://www.lmcu.org/locations/ (last accessed September 1, 2022).

CLASS ACTION COMPLAINT

## FACTUAL BACKGROUND

25.    Plaintiffs and the Class Members worked as "Mortgage Loan Officers," or "**Loan Officers**," for Defendant.

### The Role of the Loan Officer

26.    As discussed above, a Loan Officer's job is to bring new clients (borrowers) to apply for home loans, to maintain contact with borrows in order to offer refinancing of the loan, and to assist the financial institution with potential leads and sell loan products to borrowers.

27.    There are several different ways in which "leads" or borrowers could potentially be secured. One way is to "squat" at the bank in the hope that a borrower will seek guidance regarding a potential real estate purchase. Another way to secure leads is to seek out prospects. This entails Loan Officers engaging in extensive networking with realtors, brokers, loan-related vendors; developing relationships with borrowers, realtors, and vendors; and marketing loan products. The primary goal for a Loan Officer is to sell the loan products and secure the borrower-client. This involves introducing the loan products, reviewing credit applications, obtaining pre-approvals for potential borrowers, socializing with realtors and brokers, building a professional network, and engaging individuals within that network to facilitate loan transactions.

28.     To obtain and secure leads, Loan Officers frequently engage with more than 100 contacts a day – either by way of telephone calls, in-person meetings, emails, written letters, social media, or coordinated marketing efforts. The mortgage loan industry is extremely competitive, irrespective of demand, and Loan Officers must dedicate their time and energy to connect with numerous contacts to be successful. Success is measured by the number and value of loan products sold to borrower-clients. The more time a Loan Officer can spend engaging contacts, the more loans the Loan Officer can originate for the financial institution, and in turn, the more money the Loan Officer can earn.

29.     Because Loan Officers' income is _entirely_ derived from commissions, their income is directly proportional to the number and value of loans sold to borrowers, which is directly proportional to their time spent on engaging with their contacts, realtors, and vendors. In other words, a Loan Officer's income depends on the amount of time they are able to dedicate to originating business from new and existing clients.  Any time wasted on other activities goes unpaid, to the substantial detriment of the Loan Officers.

30.     A Loan Officer's income is time-dependent: They earn more of it with every additional minute they are able to devote to developing and originating new leads, creating new connections, establishing and building their network, maintaining a strong work ethic, and communicating with the borrowers, vendors,

and realtors. They are salespeople who specialize in mortgage loan originations. The substance of their compensable work entails communicating with realtors, vendors, borrowers—making new connections, maintaining existing connections, and marketing themselves and the financial institution's loan products. Time is the key component to this lead generation process is paramount. The more time they can devote to it, the more income they generate. Every minute spent on other non-compensable activities is a missed opportunity to generate income.

### Loan Officer's Operational Support: Loan Processors

31.    Since a Loan Officers' specialty is to originate loans by establishing new connections and maintaining existing ones, financial institutions that employ them—like LMCU—often provide administrative support, called Loan Processors, whose duties, responsibilities, and pay structure are temporally and substantively different from the duties and responsibilities of Loan Officers.

32.    From a temporal perspective, Loan Processors' duties and responsibilities commence where Loan Officers' duties and responsibilities end. The Loan Processor steps in once the Loan Officer secures the lead and sells the loan. Loan Processors facilitate the transaction with the borrower, acting as a liaison between borrower and underwriter, collecting documents requested by the lender, and ensuring the loan crosses the finish line through the administrative work.

CLASS ACTION COMPLAINT

33.    From a substantive perspective, a Loan Processors's duties and responsibilities are vastly different and require less knowledge, skill, and experience than required to carry out the duties and responsibilities of a Loan Officer. Specifically, a Loan Processor's duties and responsibilities include preparing loan forms and documents, organizing the file, and transitioning the loan to the approval stage.

34.    In essence, Loan Processors are there to assist Loan Officers in compiling important paperwork from the borrower; they screen for any red flags throughout the process, review and submit the loan file to the underwriter. Through this process they ensure that all details, including but not limited to debt-to-income ratios, employment information, pay stubs, and tax information are up to date and sufficient for the loan to be processed and ultimately approved.

35.    If the loan is approved, the processor will receive a list of documents that must be obtained before the loan is funded. The Loan Processor works with the Loan Originator to facilitate moving the loan through the process, corresponds with title and escrow companies, and other players within this process to ensure that all necessary paperwork is met and fulfilled.

36.    Loan Processors ensure the file does not contain any mistakes, is complete, contains accurate income information, and is clear of any red flags which may prevent loan approval.

CLASS ACTION COMPLAINT

37.    Typically, after a borrower is secured, is pre-approved and ready to proceed to obtain financing (or refinancing), the Loan Processor becomes their main contact to get the loan funded: obtaining the necessary documents, ensuring that the loan can get funded, verifying employment and related information.

38.    The Loan Processor is paid hourly to do this administrative job, which allows the Loan Officer to proceed with finding and selling new prospects. Put simply, Loan Officers utilize their knowledge, skill, experience, contacts, and professional networks to sell loans, after which Loan Processors take over the administrative tasks to complete the paperwork through funding of the loan.

39.    Plaintiffs and the Class sold mortgages for Defendant, and Defendant paid Plaintiffs and Class Members on a 100% sales commission basis.[11] Defendant paid Plaintiffs and Class Members advances on commissions but then deducted these advances from any commissions later earned. Compensation for Loan Officers at LMCU is based on a fixed percentage of the total amount of loans that each officer disbursed during the month. This percentage was given in terms of "basis points" that correlated with tiers of monthly volume. For example, for a monthly volume less than $800,000 an officer would receive 45 basis points, which means that they would earn .45% on the funded loan. For a monthly volume between $800,000 and

---

[11]    "Mortgage Careers," Lake Michigan Credit Union, https://www.lmcu.org/about/careers/mortgage/ (last accessed September 1, 2022). In LMCU's own words, the compensation of the Loan Officer "is limited only by desire and motivation to grow."

$999,999 an officer would receive 70 basis points. This tiered structure of basis points is specifically applied to external referrals. For internal referrals, basis points were capped at 30 basis points, regardless of monthly volume.

Commission Matrix:

| Tiers | Monthly Volume | Monthly Units | External Referral | Internal Referral |
|---|---|---|---|---|
| 5 | $2,000,000 + | 11+ | 90 bps | 30 bps |
| 4 | $1,500,000 - $1,999,999 | 10 | 80 bps | 30 bps |
| 3 | $1,000,000 - $1,499,999 | 7 - 9 | 75 bps | 30 bps |
| 2 | $800,000 - $999,999 | 5 - 6 | 70 bps | 30 bps |
| 1 | Less than $800,000 | 1 – 4 | 45 bps | 30 bps |

| Tiers | Monthly Volume | Monthly Units | External Referral | Internal Referral |
|---|---|---|---|---|
| 5 | $2,000,000 + | 11+ | 90 bps | 30 bps |
| 4 | $1,500,000 - $1,999,999 | 10 | 80 bps | 30 bps |
| 3 | $1,000,000 - $1,499,999 | 7 - 9 | 75 bps | 30 bps |
| 2 | $800,000 - $999,999 | 5 - 6 | 70 bps | 30 bps |
| 1 | Less than $800,000 | 1 – 4 | 45 bps | 30 bps |

40.    This structure contemplates Loan Officers having support to continue selling loan products toborrowers. This structure does not contemplate, compensate for, nor anticipate Loan Officers having to also complete an administrative loan processing job that requires devoting numerous additional hours consisting of non-compensable administrative work, such as compiling documents, communicating with brokers, borrowers, and underwriting, and completing paperwork.

41.     At LMCU, Loan Officers are forced to work for free nearly 50% of the time on administrative tasks that fall squarely outside their job description. This dramatically suppresses Loan Officers' earnings in myriad ways. First, Loan Officers receiving zero compensation for nearly 50% of their work. Second, Loan Officers lose the opportunity to essentially double the monthly loan originations. Third, Loan Officers are prevented from reaching the more highly compensated commission tiers. LMCU deprives its Loan Officers of additional salary, bonuses, or other pay and benefits.

**Brad Cook**

42.     Plaintiff **Brad Cook**, (**"Mr. Cook"** or **"Cook"**) experienced this cycle of exploitation of Loan Officers' time and efforts progressively worsen over the course of his eight (8) years at LMCU as a Loan Officer, which ultimately led to his decision to leave the credit union. Towards the end of his tenure, some loans were taking over 100 days to close due to the lack of Loan Processor support, which falls well below industry standards, and was not contemplated in Mr. Cook's compensation structure.

43.     For the last year of Mr. Cook's employment, LMCU assigned Cook an unqualified Loan Processor who was extremely overwhelmed with the workload to the point where she *regularly* adjusted her status to "Do Not Disturb" for eight (8) straight hours a day until she ended her shift. Plaintiff Cook could not contact her to

obtain <u>any</u> update as to the status of his active loans for several days, even after a slew of follow-up messages requesting said updates. When Mr. Cook approached his supervisor about the ongoing issue, he received nothing more than a useless shrug. As a result, in order to receive his vested commissions, Mr. Cook was required to work for free to finalize active applications, taking him away from compensable Loan Officer work.

44.    Plaintiff Cook worked nearly eighty (80) hours per work to meet his sales goals, including uncompensated administrative loan processing work. Mr. Cook was required to spend nearly half of his time completing administrative loan processing duties. As a result, he not only received zero income for nearly half of his work, but he also lost opportunities to secure more income from compensable commission-based work, including compensation at higher commission tiers. LMCU failed to compensate Cook for the work on the active loans, and more importantly prevented Cook from more than doubling his income.

45.    Throughout Mr. Cook's tenure, the customer service continuously spiraled downward because LMCU failed to provide a sufficient amount of Loan Processors who were qualified and able to do their job.

46.    When a loan takes an unusually long time to close, it reflects poorly primarily on the Loan Officer's reputation. This, in tandem with the fact that Mr. Cook was not being compensated for the Loan Processor tasks he was forced to

undertake, culminated in his decision to transition to another bank where he would be provided the requisite operational support and maintain his reputation as a competent, efficient, and effective Loan Officer.

47. Upon Mr. Cook's separation from LMCU, he had approximately $2,000,000 in active loans in his pipeline that had yet to be funded. Mr. Cook has yet to receive any commissions earned on these active loans.

**Hannah Ritzenhein**

48. Plaintiff **Hannah Ritzenhein ("Ms. Ritzenhein"** or **"Ritzenhein"**) was also forced to work for free nearly 50% of the time while employed at LMCU as a Loan Officer. Ritzenhein first began her employment as a Loan Processor, a role she had for one year before transitioning to Loan Officer in May of 2016. Though her position, and duties and responsibilities, changed, as well as her compensation structure from an hourly wage to 100% commission, Plaintiff Ritzenhein was still forced to perform the duties of a Loan Processor for which she received zero compensation. At one time, Plaintiff Ritzenhein **had eighty (80) active loans in the pipeline,** compared to the industry standard of around thirty (30).

49.    Plaintiff Ritzenhein worked nearly eighty (80) hours per work to try and meet her Loan Officer sales goals, about half of which she was forced to work for free to complete administrative loan processing work. Ms. Ritzenhein lost

CLASS ACTION COMPLAINT

opportunities to secure about double her income through commissions, not including the higher tiered commissions she would have earned.

50.     Since Loan Processors were paid hourly and had minimal incentives to close on loans, they were not under the same pressure as Loan Officers to increase the loan volume efficiently.

51.     LMCU purported to offer Loan Officers support by "allowing" them to hire assistants. This option to hire an assistant only became available if the Loan Officers were producing at least twenty-four (24) million dollars in loans annually. Naturally, this was intended to alleviate pressure from Loan Officers duties and responsibilities. However, it had the precise opposite effect. First, due to the overwhelming loan processing work, the assistant ultimately assisted with those *loan processing* duties. Second, unless the Loan Officer could "fund" $3,000,000 in loans over a rolling three (3) month basis, they would be responsible for paying 50% of these assistant's salary.

52.     Nevertheless, the Loan Officers could not find and hire any "assistant" they wanted, and instead were required to work with the re-assigned LMCU employees. Furthermore, Loan Officers had to invest additional time to train these assistants. As a result of LMCU's piling on the Loan Officers overburdening and uncompensated administrative duties, the Loan Officers had to train the "assistants" to complete administrative tasks on "active" loans. As such, these assistants not only

failed to serve their intended purpose of assisting the Loan Officer vis-à-vis their own duties, but rather, introduced an additional financial burden and hemorrhaged precious time. Yet LMCU benefited from this structure by forcing its Loan Officers to complete the uncompensated tasks and be also responsible for 50% of salaries of "assistants" who were assisting them on these uncompensated tasks.

53.    For example, Plaintiff Ritzenhein had to spend additional time training the assistant she hired, which proved useless when that assistant repeatedly failed to complete the assigned tasks properly. Plaintiff Ritzenhein was then forced to complete the work herself, in addition to the loan origination work that was already on her plate. Moreover, Loan Officers were required to pay 50% of the assistant's salary, unless a large volume of sales was met. The required volume was three (3) million dollars over a rolling three-month period, and if this was not met, then half the assistant's salary would be credited against the Loan Officers' commission. In the event that a Loan Officer left the company during this rolling three-month period, and had not yet met the loan volume, LMCU still required them to pay their assistant's salary, as it did with Ms. Ritzenhein.

54.    When Ms. Ritzenhein left LMCU on the middle of February, she was required to pay half of her assistant's hourly rate for the full month even though she did not utilize the assistant's services.

55.    Defendant also required Ms. Ritzenhein to pay fees associated with maintaining a database of client contact information even after she was no longer working for Defendant and no longer had access to the database. These costs were never reimbursed.

56.    Ms. Ritzenhein also did not receive *any* of the commissions on the active loans which were funded days following her departure. LMCU made substantial profit on these loans, failing to pay a single penny to Ms. Ritzenhein for her work in securing these loans. In fact, some of these loans did not require *any* additional work at all.

## **All Loan Officers**

57.    Because of Loan Officers' compensation structure, Defendant failed to pay Plaintiffs and Class Members for all hours worked, including but not limited to hours spent on gathering loan-related documents for a loan to get funded, hours spent on communications with escrow and/or title companies, employment verifications, review/assessment of debt-to-income ratios, communications with the underwriters, collection of tax information, obtaining appraisals, and other administrative/loan processing work.

58.    While these duties were typically handled by Loan Processors, Defendant forced Loan Officers to complete the uncompensated loan processing work themselves, taking significant time from their main duties.

59.    Furthermore, in addition to the loan processing work, Plaintiffs and the Class Members were also required to handle after-hours appointments, early morning appointments, weekend appointments, and attend unnecessary conferences—all of which extended their weekly hours well beyond forty (40) hours a week. They were not paid any overtime for the time spent outside their 40-hour workweek or compensated for their missed opportunities.

60.    Lastly, if a Loan Officer left the company while an originated loan was active, but had not yet been funded, that Loan Officer would earn <u>zero</u> commission on the loan despite having spent hours securing the loan and transitioning it from pre-approval status to active. This means that even if the loan closed just days after the Loan Officer's last day, they would not be credited for any portion of the commission they worked to make the loan active.

61.    <u>When a loan becomes active, it is considered "sold" and the Loan Officer is entitled to the commission earned on that "sale,"</u> although in practice commission is formally paid out once the loan is funded.

62.    Plaintiff Ritzenhein had approximately $2,338,045 in her pipeline upon separation from LMCU, for which she has earned the associated commission, totaling approximately $13,421.75. She <u>never received commission due</u> on her nine (9) active loans that had yet to be funded when she left LMCU.

63.    Plaintiff Cook also had approximately $2,000,000 in active loans in his pipeline upon separation from LMCU, for which he has earned the associated commission. He <u>never received commission due</u> on his active loans that had yet to be funded when he left LMCU.

64.    In addition to failing to compensate Plaintiffs Cook and Ritzenhein for hours worked completing Loan Processor tasks, Defendant also failed to pay overtime as required by Michigan and Federal law and failed to reimburse work travel expenses as required by Federal law. When Plaintiffs and the Class Members worked shifts over eight (8) hours per day, or over forty (40) hours per week, Defendant did not pay them overtime in accordance with the law.

65.    Furthermore, Plaintiffs were required to drive using their personal vehicles in order to meet with potential customers and secure loans. This travel was an essential part of their jobs, but <u>was never reimbursed by LMCU</u>.

66.    Defendant's conduct, as alleged herein, has caused Plaintiffs and the Class Members damages including but not limited to loss of wages and compensation. Defendant is liable to the Plaintiffs and the Class Members for failing to pay overtime wages, failing to pay all wages owed on each pay period, failing to provide accurate wage statements, failing to pay all wages owed upon separation and unfair competition.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this case as a proposed class action. Plaintiffs request that this Court certify the following individuals, (collectively, the "**Class Members**"):

a.     "**Class A**" or the "**State Unpaid Wages Class**:" All current or former LMCU Loan Officers who worked for Defendant at any time beginning three (3) years prior to the filing of the Complaint through the date of class certification order (the "**State Unpaid Wages Class Period**"), who were required to complete any work on the loan applications after the loan applications became active.

b.     "**Class B**" or the "**State Overtime Class**." All current or former LMCU Loan Officers who worked for Defendant at any time beginning three (3) years prior to the filing of the Complaint through the date of class certification order (the "**State Overtime Class Period**"), who were required to complete any work on the loan applications after the loan application became active, and worked more than forty (40) hours per workweek.

c.     "**Class C**" or the "**Separation Pay Class**:" All current or former LMCU Loan Officers who were terminated or left voluntarily at any time beginning six (6) years prior to the filing of the Complaint through the date of class certification order (the "**Separation Pay Period**"), who did not receive

commissions for their active loans within forty-five (45) days of the date of separation.

        d.      "**Class D**" or the "**Federal Unpaid Wages Class**:" All current or former LMCU Loan Officers who worked for Defendant at any time beginning two (2) years prior to the filing of the Complaint through the date of class certification order (the "**Federal Unpaid Wages Class Period**"), who were required to work on the loan after the loan application became active.

        e.      "**Class E**" or the "**Federal Overtime Class**:" All current or former LMCU Loan Officers who worked for Defendant at any time beginning two (2) years prior to the filing of the Complaint through the date of class certification order (the "**Federal Overtime Class Period**"), who were required to work on the loan after the loan application became active more than forty (40) hours per workweek.

68.    Said definition(s) may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

69.    Named Plaintiffs Hannah Ritzenhein and Brad Cook are members of Classes A, B, C, D, and E they seek to represent.

70.    The members of each class are collectively referred to as "Class Members."

CLASS ACTION COMPLAINT

71.    This action is properly joined and maintained as a class action because:

72.    <u>Numerosity</u>: The Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands throughout Michigan and the United States. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.

73.    <u>Predominance of Common Questions of Law and Fact</u>: Common questions of fact and law predominate over questions which may affect individual class members, including the following:

a.    Whether Defendant failed to pay Plaintiffs and the Class A Members minimum wages for hour worked towards completing Loan Processor duties, in violation of MCLS § 408.934;

b.    Whether Defendant failed to pay Plaintiffs and the Class B Members wages for each hour in excess of eight (8) per day, or forty (40) per week, in violation of MCLS § 408.934a;

c.    Whether Defendant issued inaccurate itemized wage statements to Plaintiffs and Class Members, by inaccurately stating the total hours worked and/or overtime pay to the detriment of Plaintiffs and the Class, in violation of MCLS § 408.479;

d.     Whether Defendant failed to compensate Plaintiffs and the Class wages due at separation for completing administrative Loan Processor responsibilities and duties, ranging from assembling and organizing documents to communicating with borrowers in obtaining/gathering the necessary documents to process loan applications; duties outside the scope of their role as Loan Officers and in violation of MCLS §§ 408.934 and 408.475.

e.     Whether Defendant violated the federal Fair Labor Standards Act (FLSA) by failing to: (1) compensate Plaintiffs and the Class for all hours worked; (2) reimburse Plaintiffs and the Class for travel expenses; and (3) keep accurate records of the hours Plaintiffs and the Class worked.

f.     The nature and extent of class-wide injury and measure of damages for the injury.

74.    <u>Typicality</u>: Plaintiffs' claims are typical to the claims of the proposed Class because Plaintiffs, as mortgage Loan Officers for Defendant, were exposed to the same unlawful business practices as other Loan Officers employed by Defendant during the Separation Pay Period, State and Federal Unpaid Wages Class Period, as well as the State and Federal Overtime Class Period that had to undertake additional unpaid work outside the scope of their role as Loan Officer. Plaintiffs and Class Members sustained the same types of damages.

75.   <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class. Plaintiffs' interests do not conflict with the interests of the other Class Members Plaintiffs seek to represent. Plaintiffs have retained counsel that is experienced in complex class action litigation and Plaintiffs intend to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

76.   A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually.

77.   The trial and the litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

78.   Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying

adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendant.

79.    Absent a class action, Defendant will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class Members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class Members will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

## <u>COUNT ONE</u>

**FAILURE TO PAY ALL MINIMUM WAGES**
**(Violation of the Improved Workforce Opportunity Wage Act (IWOWA);**
**MCLS § 403.934)**

80.    Plaintiffs repeat and reallege the allegations of the previous paragraphs and incorporate the same as if set forth herein at length.

81.    Plaintiffs bring this cause of action pursuant to 2018 Michigan Public Act 337, the Improved Workforce Opportunity Wage Act ("IWOWA"), on their own behalf and on behalf of all other similarly situated Class A Members.

82.    Class A consists of thousands of persons, the joinder of whom is impracticable.

83.    There are questions of law and fact common to the Class A, which questions are substantially similar and predominate over questions affecting the individual Class members, as set forth hereinabove.

84.    The IWOWA prohibits employers from paying employees a rate less than the rate proscribed in the Act and provides a private right of action for employees who were paid less than the prevailing wage. Mich. Comp. Laws §§ 408.413, 408.419.

85.    Defendant violated IWOWA by failing to compensate Plaintiffs and the Class A Members minimum wages for any and all hours worked completing Loan Processor tasks as a Loan Officer, depriving them of their legal rights and money.

86.    Defendant knew that Loan Processors are paid an hourly rate. Defendant knew or should have known that Plaintiffs and the Class A Members were Loan Officers who: (1) depended on Loan Processors to complete administrative tasks; (2) were not expected nor required to complete Loan Processors' administrative duties; and (3) were paid solely on commission generated from securing new loans. Defendant exploited Plaintiffs and the Class A Members time and efforts to save money by: (1) not having to pay Loan Processors to do the work; and (2) drawing Loan Officers' commissions earned against the previous month's minimum commission paid as a result of the Loan Officers' inability to secure the minimum monthly commission due to the additional workload.

87.    IWOWA defines "employ" broadly as engage, suffer, or permit to work. Mich. Comp. Laws § 408.412(b).

88.    "Employer" is defined as a person, firm, or corporation and a person acting in the interest of the employer, who employs two or more employees at any one time within a calendar year. Mich. Comp. Laws § 408.412(d).

89.    "Employee" is defined as an individual who is sixteen (16) years or older employed at a fixed designated site by the employer and includes a minor employed subject to § 15(a) of the Youth Employment Standards Act. Mich. Comp. Laws § 408.932(c).

90.    At all relevant times, Plaintiffs and Class A Members were "employees" and were not exempt from the minimum wage payment requirements set forth by § 408.934.

91.    The minimum wage for Michigan is $10.10 per hour. Mich. Comp. Laws § 408.934(1).

92.    Defendant never paid Plaintiffs and the Class A Members minimum wages for the hours worked completing Loan Processor duties. Defendant strictly compensated Plaintiffs and Class A Members on a Loan Officer's commission basis, despite their working as both a Loan Officer and a Loan Processor. Thus, Defendant failed to adequately compensate Plaintiffs and Class A Members for all hours worked.

93.    Defendant's actions as described herein were done with conscious disregard of Plaintiffs' rights.

94.    As a direct result of these minimum wage payment violations, Plaintiffs and Class A Members have suffered, and continue to suffer, damages in the amount of the entire hourly wages that should have been paid, an equal additional amount as liquidated damages, attorney's fees and costs, and a civil fine up to $1,000. Mich. Comp. Laws §§ 408.939(1); 408.939(3).

## COUNT TWO

### FAILURE TO PAY ALL OVERTIME WAGES
### (Violation of IWOWA; MCLS § 408.934a)

95.    Plaintiffs repeat and reallege the allegations of the previous paragraphs and incorporate the same as if set forth herein at length.

96.    Class B consists of thousands of persons, the joinder of whom is impracticable.

97.    There are questions of law and fact common to Class B, which are substantially similar and predominate over questions affecting the individual Class members, as set forth hereinabove.

98.    IWOWA requires employers to pay employees not less than one and one-half times the employee's regular rate for hours worked in excess of 40 per workweek. Mich. Comp. Laws § 408.934a(1). In a work period of twenty-eight (28) consecutive days, the employee receives for tours of duty, which in the aggregate

exceed two hundred sixteen (216) hours, compensation for those hours in excess of 216 at a rate not less than one and one-half times the regular rate at which the employee is employed. Mich. Comp. Laws § 408.934a(2)(a). The employee's regular rate shall be not less than the statutory minimum hourly rate. Id.

99.    Defendant violated IWOWA by failing to compensate Plaintiffs and the Class B Members overtime wages for all hours worked completing Loan Processor tasks as a Loan Officer, depriving them of their legal rights and money.

100.    Defendant knew that Loan Processors are paid an hourly rate for 40-hour work weeks. Defendant knew or should have known that Plaintiffs and the Class B Members were Loan Officers who: (1) depended on Loan Processors to complete administrative tasks; (2) were not expected nor required to complete Loan Processors' administrative duties; and (3) were paid solely on commission generated from securing new loans. Defendant exploited Plaintiffs and the Class B Members time and efforts to save money by: (1) not having to pay Loan Processors to do the work; (2) drawing Loan Officers' commissions earned against the previous month's minimum commission paid as a result of the Loan Officers' inability to secure the minimum monthly commission due to the additional workload; and (3) refusing to pay Loan Officers for the overtime hours worked completing Loan Processor tasks.

101.    During the State Overtime Class Period, Plaintiffs and other members of Class B consistently worked more than forty (40) hours a week on Loan Processor

CLASS ACTION COMPLAINT

tasks that were not part of their duties as a Loan Officer. When the COVID-19 Pandemic began, Loan Officers, including Plaintiffs, were working sixty to eighty-hour (60-80) work weeks—due to lack of sufficient Loan Processors—and suffered decreased sales commissions as a result of missed opportunities and inability to allocate the requisite time to bringing in new leads.

102.   Because Plaintiffs and Class B Members were paid solely based on a fixed loan percentage that translated into basis points, any overtime hours Plaintiffs and Class B Members worked were not considered in determining their compensation. Thus, Defendant failed to compensate Plaintiffs and Class B Members overtime wages as required by Michigan Law.

103.   Defendants' actions as described herein were done with conscious disregard to Plaintiffs' rights.

104.   As a direct result of Defendant's overtime wage payment violations, Plaintiffs and Class B Members have suffered and continue to suffer damages in the amount of the entire overtime wages that should have been paid, an equal additional amount as liquidated damages, attorney's fees and costs, and a civil fine up to $1,000. Mich. Comp. Laws §§ 408.939(1); 408.939(3).

///

///

///

CLASS ACTION COMPLAINT

## COUNT THREE

### FAILURE TO PAY ALL COMMISSION DUE AT SEPARATION

### (Violation of Sales Representative Commission Act ("SRCA"); MCLS § 600.2961(4))

105.   Plaintiffs and Class C Members repeat and reallege the allegations of the previous paragraphs and incorporate the same as if set forth herein at length.

106.   Plaintiffs bring this cause of action pursuant to the Michigan Sales Representative Commission Act ("SRCA") MCLS § 600.2961, on their behalf and on behalf of all other similarly situated Class C Members.

107.   Under the SRCA, all commissions due at the time of the termination of a contract between a sales representative and principal must be paid within forty-five (45) days after the date of the termination. MCLS § 600.2961(4).

108.   The legislative intent of the SRCA is to "ensure that sales representatives receive the commissions to which they are entitled," including "post-termination commissions;" The SRCA enforces mandated "penalties for failure to make the payment." [Senate Legislative Analysis, SB 717, April 30, 1992].[12]

---

[12] See also Randall J. Gillary & Kevin P. Albus, *Michigan's Sales Representative Commission Act: A Primer*, Mich. Bar. J., Nov. 2017, at 40. "The Michigan Sales Representative Commission Act was enacted in 1992 "to ensure that sales representatives are paid the commissions to which they are entitled, especially where those commissions come due after the termination of the employment relationship." (quoting *Walters v. Bloomfield Hills Furniture*, 228 Mich App 160, 164; 577 NW2d 206, 208 (1998)).

109.   Defendant is a "principal" under the SRCA because, as the largest credit union in Michigan, it "contracts with a sales representative to solicit order for or sell a product [loans] in this state." § 600.2961(1)(d)(ii).

110.   Plaintiffs and Class C Members are "sales representatives" protected by the SRCA because Loan Officers are employed by Defendant for "the solicitation of orders or sale of goods," and are paid entirely by commission. § 600.2961(1)(e).

111.   Defendant violated § 600.2961(4) by <u>entirely</u> failing to compensate Plaintiffs for commissions due after the date of separation.

112.   In the financial industry, ***commission-based officers and brokers earn their commission when the client signs the agreement***. [13] In the context of mortgage loans, this occurs when the client signs the loan agreement, and the loan becomes "active."

---

[13] Commission-based officers and brokers in the financial industry earn their commission when the client signs the agreement, and it is thus, "active," rather than when the loan is funded, unless a contract clearly states otherwise. *RC Royal Dev. & Realty Corp. v. Standard Pac. Corp.*, 100 Cal. Rptr. 3d 115, 121-22 (Cal. 2d Dist. Ct. App. 2009) (holding that a mortgage broker earned commission when the contract was entered into without regard to whether the sale was complete); *R. J. Kuhl Corp. v. Sullivan*, 17 Cal. Rptr. 2d 425, 432 (Cal. 2d Dist. Ct. App. 1993) (holding that unless a contract specifically provides otherwise, commission is earned upon entry into an agreement, not when the loan is funded). While LMCU labels its employees in question "Loan Officers," industry regulators regard mortgage brokers and Loan Officers as falling under the same "loan originator" category. *12 C.F.R. §1026.36(a)*

CLASS ACTION COMPLAINT

113.    Plaintiff Cook active loans in his pipeline valued at approximately $2,000,000 that had yet to be funded, and for which he has not been paid his due commission.

114.    Plaintiff Ritzenhein had nine (9) "active" loans valued at approximately $2,338,045 in her pipeline, for which she has earned the associated commission, totaling approximately $13,421.75 when she voluntarily left LMCU in February of 2022.

115.    Due to various deductions, several of them improper, Plaintiff Ritzenhein was formally due $10,446.80 in commissions at the time of her separation.[14] However, excluding the improper deductions, Ms. Ritzenhein is due $13,421.75 in commission. $1,600 was improperly deducted from the amount owed to Plaintiff in commissions at the time of her separation because Defendant had drawn $1,600 against Plaintiff Ritzenhein's upcoming commissions the previous month when she did not sell enough loans to meet the minimum payout for the month.

116.    The reasons Plaintiff Ritzenhein did not sell enough loans to meet the minimum payout for the month prior to her separation have been outlined above—

---

[14] Plaintiff Ritzenhein had earned $13,421.75 in commissions that had not yet been paid at the time of her separation. Of that, $2,974.95 was deducted, in the form of a $1,600 draw, an $80 license, and $1,294.95 for the salary her Loan Officer Assistant, which she was required to pay because she did not meet the volume required for LMCU to pay the salary in full.

Riztenhein's time was splintered between her duties as a Loan Officer and the Loan Processor responsibilities where she was forced work for free on administrative loan processing work. As a result, Plaintiff Ritzenhein was unable to focus her time and efforts on her commission-earning responsibilities, decreasing the amount of loans she was able to sell and preventing her from earning income for nearly half of her work.

117.    Furthermore, $1,294.95 was improperly deducted from the amount owed to Plaintiff Ritzenhein in commissions at the time of her separation to pay half of Plaintiff Ritzenhein's assistant's salary, because Plaintiff Ritzenhein did not sell enough loans to meet the required volume for LMCU to pay the assistant's salary in full.

118.    Again, the reasons Plaintiff Ritzenhein did not meet the minimum payout for the month prior to her separation have been outlined above—Riztenhein's time was splintered between her duties as a Loan Officer while also performing an uncompensated work on the active loan applications. As a result, Plaintiff Ritzenhein was unable to focus her time and efforts on her commission-earning responsibilities, decreasing the amount of loans she was able to sell.

119.    Defendant was aware of Plaintiff Ritzenhein's nine (9) active loans and Plaintiff Cook's active loans, and yet intentionally failed to pay the commissions due at separation, in violation of § 600.2961(4).

CLASS ACTION COMPLAINT

120.    Assuming *arguendo* that a Loan Officer's commission is due at the point at which the loan is not only "active," but also funded, Defendant has still violated § 600.2961(4) because Defendant has failed to compensate Plaintiff Ritzenhein for the then nine (9) active loans that have since been funded within forty-five (45) days of date of funding. *See Walters v. Bloomfield Hills Furniture*, 228 Mich. App. 160, 165-166 (finding that where an employment contract defined the commission "due" date as the date the goods are delivered, Mich. Comp. Laws §600.2961(4) conferred upon the employee the right to receive commissions coming due after the termination date within forty-five days after the date on which the commissions became "due.")

121. To date, Defendant has failed to compensate Plaintiffs Ritzenhein and Cook for any commissions due at separation.

122. Any contractual employment provision that purports to waive any right under M.C.L. § 600.2961 is void. *See* M.S.A. § 27A.2961(8).

123.    Defendant failed to comply with § 600.2961 by withholding commissions, and is liable to Plaintiffs for all of the following:

a.  Actual damages caused by failure to pay the commissions when due. § 600.2961(5)(a).

b.  Reasonable attorney fees and court costs. § 600.2961(6).

124.    Furthermore, Defendant was aware of the industry standard and of Plaintiff Ritzenhein's nine (9) active loans upon separation. Because Defendant "intentionally failed" to the pay Ms. Ritzenhein's commissions due at separation, Defendant is liable for actual damages in addition to an amount equal to two (2) times the commissions owed to Plaintiff Ritzenhein but not paid as required by § 600.2961(5)(b).[15]

125.    No evidence of bad faith is required before double-damages can be imposed on Defendant for failure to pay a commission under MCL § 600.2961(4).

126.    Defendant continues to exploit Plaintiffs and Class C Members by refusing to pay Plaintiffs their earned commissions after separation.

127.    As a direct result of the Defendant's violation of § 600.2961, Plaintiffs have suffered and continue to suffer damages in addition to an amount of the entire compensation that should have been paid, two (2) times the amount of commissions owed to Plaintiffs (approximately $26,843.50 to Plaintiff Ritzenhein and the amount to be determined to Plaintiff Cook) but not paid as required by § 600.2961(5)(b), and attorney's fees and costs.

///

///

---

[15] *See Linsell v. Applied Handling, Inc.*, 266 Mich. App. 1, 697 N.W.2d 913, 2005 Mich. App. LEXIS 962 (Mich. Ct. App. 2005) (clarifying MCL §600.2961 provides for an award of actual damages plus an additional award of two times the amount of commissions due, not to exceed $100,000.)

CLASS ACTION COMPLAINT

## COUNT FOUR

### FEDERAL LABOR STANDARDS ACT ("FLSA")
### MINIMUM WAGE AND HOUR VIOLATIONS

128.    Plaintiffs and Class D Members repeat and reallege the allegations of the previous paragraphs and incorporate the same as if set forth herein at length.

129.    Plaintiffs and Class D Members bring this cause of action pursuant to the Federal Labor Standards Act ("**FLSA**"), on their behalf and on behalf of all other similarly situated Class D Members.

130.    The FLSA requires covered employers to pay their employees a minimum wage of not less than $7.25 per hour. *See* 29 U.S.C. § 206(a).

131. At all relevant times, Plaintiffs and Class D Members were (and/or continue to be) "employees" within the meaning of 29 U.S.C. § 203(e)(1) and were (and/or continue to be) employed by covered "employers" within the meaning of 29 U.S.C. § 203(d), engaging in an "enterprise" within the meaning of 29 U.S.C. § 203 (r)(1).

132.    At all relevant times, Defendant employed (and/or continues to employ) Plaintiffs and Class D Members within the broad meaning of 29 U.S.C. § 203(g).

133.    No exemptions provided by the FLSA regulating the duty of employers to pay employees for all hours worked at the required minimum wage rate are applicable to Defendant, Plaintiffs, or Class D Members.

134.    Defendant violated the FLSA by failing to compensate Plaintiffs and the Class D Members minimum wages for any and all hours worked completing Loan Processor tasks as a Loan Officer, depriving them of their legal rights and money.

135.    Defendant knew that Loan Processors are paid an hourly rate. Defendant knew or should have known that Plaintiffs and the Class D Members were Loan Officers who: (1) depended on Loan Processors to complete administrative tasks; (2) were not expected nor required to complete Loan Processors' administrative duties; and (3) were paid solely on commission generated from securing new loans. Defendant exploited Plaintiffs and the Class D Members time and efforts to save money by: (1) not having to pay Loan Processors to do the work; and (2) drawing Loan Officers' commissions earned against the previous month's minimum commission paid as a result of the Loan Officers' inability to secure the minimum monthly commission due to the additional workload.

136.    Defendant never paid Plaintiffs and the Class D Members minimum wages for the hours worked completing Loan Processor duties. Defendant strictly compensated Plaintiffs and Class D Members on a Loan Officer's commission basis, despite their working as both a Loan Officer and a Loan Processor. Thus, Defendant failed to adequately compensate Plaintiffs and Class D Members for all hours worked.

CLASS ACTION COMPLAINT

137.    Defendant further violated the FLSA by failing to reimburse Loan Officers for travel expenses, which resulted in a "kick back" to Defendant, sufficient to cause minimum wage violations and deprive Plaintiffs and Class D Members of their legal rights and money.

138.    The Code of Federal Regulations ("CFR") Section 531.35 prohibits money being "kicked back" to employers in the form of under or un-reimbursed travel expenses if those expenses cause the employee's effective salary to be less than the FLSA's required minimum wage. 29 C.F.R. § 531.35; 29 U.S.C. § 206(a).

139.    Defendant knew that Loan Officers are paid at an hourly rate. Defendant knew or should have known that in order to sell loans that Loan Officers: (1) needed to meet with potential customers both at the bank and in other locations; (2) that these meetings were necessary because Loan Officers are required to make and exploit their own connections and networks in order to sell loans and earn their commissions; (3) that in order to meet with potential customers at other locations, Loan Officers traveled using their private vehicles; and (4) that in doing so, Loan Officers expended their own money on their travel.

140.    Defendants failed to reimburse Plaintiffs and Class D Members for their travel expenses. As a result, Plaintiffs' and Class D Members' actual salaries were less than the required minimum wage. Thus, Defendant failed to adequately compensate Plaintiffs and Class D Members for all hours worked.

141.     Defendant's actions as described herein were done with conscious disregard of Plaintiffs' rights.

142.     Defendant's failure to pay the minimum wage in accordance with the FLSA was willful and not based on a good faith belief that its conduct did not violate the FLSA. As such, the foregoing conduct, as alleged, constituted a willful violation within the meaning of the FLSA. 29 U.S.C. § 255(a).

143.     As a direct result of these minimum wage payment violations, Plaintiffs and Class D Members have suffered and continue to suffer damages and are entitled to recovery of all unpaid minimum wages, and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b).

## <u>COUNT FIVE</u>

### FEDERAL LABOR STANDARDS ACT ("FLSA")
### OVERTIME WAGE AND HOUR VIOLATIONS

144.     Plaintiffs and Class E Members repeat and reallege the allegations of the previous paragraphs and incorporate the same as if set forth herein at length.

145.     Plaintiffs and Class E Members bring this cause of action pursuant to the Federal Labor Standards Act ("FLSA"), on their behalf and on behalf of all other similarly situated Class E Members.

146.     Under the FLSA, employers must pay overtime to employees for all hours worked in excess of forty (40) in a workweek at a rate of not less than time and one-half their regular hourly rates of pay. *See* 29 U.S.C. § 207(a).

147.    At all relevant times, Plaintiffs and Class E Members were (and/or continue to be) "employees" within the meaning of 29 U.S.C. § 203(e)(1) and were (and/or continue to be) employed by covered "employers" within the meaning of 29 U.S.C. § 203(d), engaging in an "enterprise" within the meaning of 29 U.S.C. § 203 (r)(1).

148.    At all relevant times, the Defendants jointly employed (and/or continue to employ) Plaintiffs and Class E Members within the broad meaning of 29 U.S.C. § 203(g).

149.    None of the exemptions provided by the FLSA regulating the duty of employers to pay overtime at a rate not less than one and one-half times the regular rate at which its employees are employed are applicable to Defendant, Plaintiffs, or Class E Members.

150.    Defendant violated the FLSA by failing to compensate Plaintiffs and the Class E Members overtime wages for all hours worked completing Loan Processor tasks as a Loan Officer, depriving them of their legal rights and money.

151.    Defendant knew that Loan Processors are paid an hourly rate for 40-hour work weeks. Defendant knew or should have known that Plaintiffs and the Class E Members were Loan Officers who: (1) depended on Loan Processors to complete administrative tasks; (2) were not expected nor required to complete Loan Processors' administrative duties; and (3) were paid solely on commission generated

from securing new loans. Defendant exploited Plaintiffs and the Class E Members time and efforts to save money by: (1) not having to pay Loan Processors to do the work; (2) drawing Loan Officers' commissions earned against the previous month's minimum commission paid as a result of the Loan Officers' inability to secure the minimum monthly commission due to the additional workload; and (3) refusing to pay Loan Officers for the overtime hours worked completing Loan Processor tasks.

152.    During the Federal Overtime Class Period, Plaintiffs and other members of Class E consistently worked more than forty (40) hours a week on Loan Processor tasks that were not part of their duties as a Loan Officer. When the COVID-19 Pandemic began, Loan Officers, including Plaintiffs, were working sixty to eighty-hour (60-80) work weeks—due to lack of sufficient, adequate Loan Processors—and suffered decreased sales commissions as a result of missed opportunities and inability to allocate the requisite time to bringing in new leads.

153.    Because Plaintiffs and Class E Members were paid solely based on a fixed loan percentage translated into basis points, any overtime hours Plaintiffs and Class E Members worked were not considered in determining their compensation. Thus, Defendant failed to compensate Plaintiffs and Class E Members overtime wages as required by Michigan Law.

154.    Defendant further violated the FLSA by failing to reimburse Loan Officers for travel expenses, which resulted in a "kick back" to Defendant sufficient

to cause overtime pay violations and deprive Plaintiffs and Class E Members of their legal rights and money.

155.   CFR Section 531.35 states that the FLSA's wage requirements are not met where kickbacks in the form of under or un-reimbursed travel expenses result in payments below the required wage, including below the required overtime wage. 29 C.F.R. § 531.35; 29 U.S.C. § 207(a)(1).

156.   Defendant knew or should have known that Loan Officers (1) are paid at an hourly rate and (2) that in order to effectively complete their jobs and earn commissions, Loan Officers were required to work 60-80 hours per week, out of which at least 40% or more was dedicated to completing Loan Processing duties.

157.   Defendant knew or should have known that in order to sell loans, Loan Officers: (1) spent at least part of their overtime hours meeting with potential customers at the bank and other locations; (2) that those meetings were necessary because Loan Officers are required to make and exploit their own connections and networks in order to sell loans and earn their commissions; (3) that in order to meet with potential customers at other locations, Loan Officers traveled using their private vehicles; and (4) that in doing so, Loan Officers expended their own money on travel.

158.   Defendants failed to reimburse Plaintiffs and Class E Members for their travel expenses. As a result, Plaintiffs and Class E Members' actual wages for

overtime hours were less than the required overtime compensation. Thus, Defendant failed to adequately compensate Plaintiffs and Class E Members for overtime hours worked.

159.    Defendant's actions as described herein were done with conscious disregard to Plaintiffs' rights.

160.    Defendant's failure to pay overtime in accordance with the FLSA was willful and not based on a good faith belief that its conduct did not violate the FLSA. As such, the foregoing conduct, as alleged, constituted a willful violation within the meaning of the FLSA. 29 U.S.C. § 255(a).

161.    As a direct result of Defendant's overtime wage payment violations, Plaintiffs and Class E Members have suffered and continue to suffer damages and are entitled to recovery of all unpaid minimum wages, and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b).

## COUNT SIX

### FLSA RECORD KEEPING VIOLATIONS

162.    Plaintiffs and Classes D and E (collectively Class Members for the purposes of this Count Six) Members repeat and reallege the allegations of the previous paragraphs, and incorporate the same as if set forth herein at length.

163.    Defendant violated the FLSA by failing (and continuing to fail) to make, keep, and preserve accurate records with respect to Plaintiffs and Class

Members, including hours worked each workday and total hours worked each workweek, as required by the FLSA, 29 U.S.C. § 211(c).

164.    Defendant's failure to provide these statements has caused Plaintiffs and Class D and E Members to incur economic damages due to the fact that they were unaware that they have been owed minimum and overtime wages for hours worked completing Loan Processor tasks. In failing to provide accurate information regarding hours worked, Defendant disguised their underpayment of wages to Plaintiffs and Class D and E Members.

## COUNT SEVEN

## RESTITUTION BASED ON UNJUST ENRICHMENT

165.    Plaintiffs and all Class Members (consisting of all Classes A-E for the purposes of this section) repeat and reallege the allegations of the previous paragraphs and incorporate the same as if set forth herein at length.

166.    Plaintiffs bring this cause of action pursuant to common law equitable doctrine of unjust enrichment, on their behalf and on behalf of all other similarly situated Class Members.

167.    Plaintiffs and the Class Members have conferred a benefit on Defendant by securing new loans pursuant to responsibilities as a Loan Officer and completing Loan Processor administrative tasks, thereby limiting their ability to secure new loans. Defendant has been unjustly enriched by failing to thoroughly

CLASS ACTION COMPLAINT

compensate and withholding compensation from Plaintiffs and the Class for this work and the resulting loan-generated income for Defendant.

168.    Defendant never paid Plaintiffs and the Class minimum wages for the hours worked completing Loan Processor duties. Defendant strictly compensated Plaintiffs and the Class on a Loan Officer's commission basis, despite their working as both a Loan Officer and a Loan Processor. Furthermore, Defendant failed to pay Plaintiffs and Class C Members earned commissions to which they were entitled. Defendant further exploited Plaintiffs and Class Members by improperly deducting from their earned commissions when they did not meet certain sales requirements, though they did not do so only because Defendant forced Loan Officers to work for free and provide administrative support. Defendant never reimbursed Plaintiffs and the Class for travel expenses for travel which was necessary to secure loans. Thus, Defendant failed to adequately compensate Plaintiffs and the Class.

169.    After Plaintiff Ritzenhein left LMCU, Defendant still required Ms. Ritzenhein to cover her assistant's hourly rate out of pocket, despite the fact that this assistant was no longer working on Ms. Ritzenhein's originated loans. Further, Defendant failed to pay both Plaintiffs the commissions due on the active loans in their pipeline upon separation.

170.    Defendant also required Ms. Ritzenhein to pay fees associated with maintaining a client database she no longer had access to, as she was no longer employed at LMCU. Defendant never reimbursed Plaintiff Ritzenhein, but unjustly benefitted from Ms. Ritzenhein covering these costs.

171.    After Plaintiff Cook left LMCU, Defendant failed to pay Mr. Cook the commissions he was due on the active loans in his pipeline upon separation. Thus, Defendant has unjustly benefitted from Mr. Cook's time and effort in securing the loans during his tenure at LMCU.

172.    Defendant has been unjustly enriched by refusing to pay minimum and overtime wages and withholding commissions after separation to which Plaintiffs were entitled.

173.    Defendant failed to compensate Plaintiffs and Class Members, thereby exploiting Loan Officers. This limited their ability to make sales, and ultimately resulted in their inability to reach certain minimum sales targets. As a result of this, Defendant withheld commissions otherwise earned by Loan Officers.

174.    Plaintiffs and Class Members were required to drive using their personal vehicles in order to meet with potential borrowers and secure loans. This travel was an essential part of their jobs, but was never reimbursed by LMCU.

175.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and all Class Members are entitled to restitution in an amount to be proved at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment and relief on all Causes of Action as follows:

A.     An order that this action may proceed as a class action;

B.     An order appoint Plaintiffs as class representatives, and Plaintiffs' counsel as the counsel for all classes;

C.     For all unpaid overtime wages and liquidated damages due to Plaintiffs and Class B and D Members on their overtime wage claim;

D.     For all unpaid wages due to Plaintiffs and all Class Members they would have earned had Defendant adequately compensated them;

E.     For all statutory penalties for Plaintiffs and Class E Members including, but not limited to, MCL § 408.939;

F.     For all federal statutory penalties including, but not limited to, 29 U.S.C. §§ 216(b), 216(e)(2).

G.     An order requiring Defendant to comply with the above labor laws, with respect to all currently employed members of all Classes;

H.    Damages for Plaintiffs and all Class Members against Defendant in an amount to be determined at trial, together with pre- and post-judgement interest at the maximum rate allowable by law on any amounts awarded;

I.    Restitution for Plaintiffs and all Class Members and/or disgorgement in an amount to be determined at trial;

J.    Reasonable attorneys' fees and costs; and

K.    Granting such other and further as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial on all triable issues.

DATED: September 1, 2022              **CLARKSON LAW FIRM, P.C.**

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (P68616)
*rclarkson@clarksonlawfirm.com*
Yana Hart *(Pro Hac Vice Forthcoming)*
*yhart@clarksonlawfirm.com*
Tiara Avaness (*Pro Hac Vice Forthcoming*)
*tavaness@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

_____

CLASS ACTION COMPLAINT